**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LIFE CELEBRATION, INC.,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **XEROX CORP.,** | : | **No. 18-2941** |
| *Defendant* | : | |

**M E M O R A N D U M**

PRATTER, J.                                              AUGUST *28*, 2020

Life Celebration, Inc., a funeral printing business, leases printing equipment and related services from Xerox Corporation and also decided to sublease thousands of square feet of facility space from Xerox. Life Celebration contends that Xerox breached its alleged contractual obligation to maintain the facility space in a suitable condition and fraudulently misrepresented to Life Celebration that it could inhabit the space for a longer time period than Xerox could guarantee its occupancy. Life Celebration brought this action asserting breach of contract and misrepresentation claims against Xerox. Xerox filed a motion for complete summary judgment in its favor. In opposition to the motion, Life Celebration now raises for the first time an anticipatory breach argument, which Xerox contends was improper. For the reasons detailed below, the Court grants Xerox's motion for summary judgment in its entirety.

## BACKGROUND

### I.      Procedural Background

Life Celebration brought this action against Xerox asserting breach of contract and "misrepresentation/concealment" claims in July 2018. Compl. at ¶ 16 (Doc. No. 1). Xerox moved for the Court to grant summary judgment in its favor as to both claims and to dismiss this action

in its entirety.  Life Celebration's new assertion of an additional anticipatory breach claim was advanced without seeking leave to submit a surreply or to raise new claims.

Xerox moved to strike Life Celebration's surreply.[1]  Although during the oral argument on the Xerox motions the parties' counsel communicated that they were interested in a referral to a magistrate judge in order to engage in settlement proceedings, and the Court did so,  the settlement conference was cancelled after it became apparent that conciliatory efforts between the parties had been deemed futile.

## II.     Factual Background

### A.    Primary Lease of 125 Hartman Road Facility

Beginning in October 1999, Xerox leased over 60,000 square feet in a building located at 125 Hartman Road, North Wales, Pennsylvania from Nappan & Associates.  In pertinent part, the primary lease stated that Xerox, as the lessee, was responsible for the following:

> [A]ll necessary or appropriate repairs, replacements, renewals, and additions . . . required to keep and maintain the Premises and all systems, equipment and apparatus appurtenant thereto or used in connection therewith in good order and condition . . . . Lessee agrees that it shall, to the extent generally available, at its cost and expense, enter into a service contract or contracts with responsible service companies providing for at least two (2) semi-annual periodic inspections of the hearing and air-conditions portions of the above Premises . . . .

Nappan & Associates Lease at § 6, Pl.'s Ex. 20 (Doc. No. 22-7).

---

[1]     Xerox argues that the surreply is untimely, that Life Celebration filed its surreply without good cause, and that the surreply improperly attempts to expand the record.  According to Life Celebration, it filed its surreply to "correct a consequential factual inaccuracy by Xerox," Pl.'s Surreply at 1 (Doc. No. 31)—allegedly asserted for the first time in Xerox's pretrial memorandum—that "[p]ursuant to the 2007 [managed services order], Xerox provided Life Celebration space at a facility located at 125 Hartman Road, North Wales, Pennsylvania."  *Id.*  But Xerox asserted this same factual contention in its statement of undisputed facts in support of its motion for summary judgment. Def.'s Statement of Undisputed Facts at ¶ 21 (Doc. No. 20-3) ("Pursuant to and in accordance with the 2007 [managed services order], Xerox provided Life Celebration with space at a facility located at 125 Hartman Road, North Wales, Pennsylvania.") (citations omitted).  Because Life Celebration submitted a late surreply without offering any legitimate reason for doing so, the Court grants Xerox's motion to strike.

In September 2014, Xerox assigned the remainder of the primary lease to Direct Mail of Maine, Inc. If not renewed by Direct Mail of Maine, Inc., the primary lease was slated to expire in March 2020. The primary lease also provides for a "holding over" period that can continue indefinitely on year-to-year terms after the lease expires.

### B.   Preliminary Background on the Subleases

Both parties acknowledge that they believe they entered into a sublease agreement or agreements for a portion of the 125 Hartman Road facility starting in 2007. However, they dispute what memorializes the assertedly valid contractual agreement or agreements. Xerox contends that subleases were formed and documented through vague references in various managed services orders governed by the Managed Services Agreement (MSA), a master agreement between the parties. Conversely, Life Celebration cites the deposition testimony of Gerald S. Givnish, an owner of Life Celebration, to suggest that a sublease was formed orally during a 2007 conversation between Mr. Givnish and John McGrorty, a former Xerox executive. According to Life Celebration, the managed services orders *referenced* the oral sublease but did not provide the terms or conditions thereof. Life Celebration similarly contends that the terms and provisions governing the MSA do not apply to the oral sublease.

### C.   The Managed Services Agreement

The Givnish Group, Inc. and Affiliates, doing business as Founders Service Corporation, an operator of funeral homes, wanted to lease both printing equipment and workspace from Xerox. No longer wanting to rely on outside vendors, Founders sought to print materials for funerals at its own business location. In October 2007, Xerox and Founders entered into the Managed Services Agreement, which provides terms and conditions for all subsequent "Managed Services Orders" and "Statements of Work." MSA at ¶¶ 1-2, Def.'s Ex. C (Doc. No. 20-7). According to Xerox,

the managed services orders governed by the MSA provided the means for Founders to obtain "[o]fferings" from Xerox, including "[s]ervices," "[d]eliverables," and "[s]taffing and [m]anagement [s]ervices." *Id.* Because Xerox asserts that the sublease agreements were formed pursuant to managed services orders governed by the MSA, Xerox argues that the following MSA provisions reproduced—or, given the subject matter of this action, copied (perhaps even "xeroxed")—below, apply to the sublease agreement between the parties.

First, the MSA contains the following services warranty disclaimer:

> THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION FOR SERVICES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED THEREFORE AND XEROX'S DISCLAIMS, AND CUSTOMER WAIVES, ALL OTHER WARRANTIES FOR SERVICES, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY.

*Id.* at ¶ 7(c).

Second, the MSA contains a provision limiting Xerox's liability over damages arising out of or relating to the MSA or subsequent orders:

> LIMITATION OF LIABILITY.   Xerox shall not be liable to Customer, in the aggregate, for any direct damages in excess of the amounts paid by Customer to Xerox during the twelve (12) months prior to the claim pursuant to the Order under which the claim arose or $50,000, whichever is greater, and neither party shall be liable to the other for any special, indirect, incidental, consequential or punitive damages arising out of or relating to this MSA or any Order entered hereunder, whether the claim alleges tortious conduct (including negligence) or any other legal theory. . . .

*Id.* at ¶ 15.

Third, the MSA contains the following merger clause:

> This MSA, its attachments and any Order hereunder constitute the entire agreement between the parties as to its subject matter and supersede all prior and contemporaneous oral and written agreements as they pertain to such subject matter.   All changes to

4

> this MSA or an Order must be made in a writing signed by both
> parties. The parties agree that in the event of any conflict between
> the terms and conditions in this MSA and any Order, the terms and
> conditions of this MSA shall prevail except where expressly stated
> herein.

*Id.* at p. 8.

Finally, the MSA states that in the event Xerox provides inadequate services:

> Customer agrees to notify Xerox in writing detailing its concerns in
> that regard. No later than ten (10) days following Xerox's receipt
> of said notice, Xerox and Customer agree to meet, clarify the
> Customer's concern(s) and begin to develop a corrective action plan
> ("Plan") to remedy such alleged non-compliance. As Customer's
> exclusive remedy for Xerox's non-compliance, Xerox, within sixty
> (60) days of finalizing the Plan or a time period otherwise agreed to
> in writing by the parties, will then either modify such Services so
> they are compliant with such [Statements of Work] or re-do the work
> at no additional charge.

*Id.* at ¶ 7(a).

The MSA further states that it "and any Order hereunder shall be construed under the laws

of the State of New York (without regard to conflict-of-law principles)." *Id.* at ¶ 20(a).

### D.   The 2007 Managed Services Order (the 2007 MSO)

In October 2007, Founders and Xerox entered into a managed services order (the 2007

MSO) incorporating the terms and conditions of the MSA. Xerox asserts that it leased to Founders

printing equipment and the 125 Hartman Road facility space through the 2007 MSO.[2]  In the 2007

MSO, Founders agreed to submit sixty (60) monthly minimum payments of $23,248.52 for (a)

"Xerox Equipment/Software"; (b) "Xerox Quotes Offerings and/or Services" consisting of a

"Facility Cost"[3]; and (c) staffing and management services as well as a one-time "Build-out

---

[2]      Because Life Celebration contends that the sublease is an oral agreement, it refers to the alleged
oral sublease and the printer equipment leases as "coterminous leases."

[3]      The dollar amounts for the facility costs are not listed on the 2007 MSO or subsequent managed
services orders. The managed services orders created in 2012 and 2016 only reference a "modification to

Charge" of $7,000.  2007 MSO at 2, Def.'s Ex. D (Doc. No. 20-8).  Xerox contends that Life

Celebration's payments for its sublease were incorporated in the monthly payments. Although Life

Celebration refutes that the 2007 MSO created the sublease, it acknowledges that the 2007 MSO

and subsequent managed services orders "make reference to the monthly payment amount and

length of sublease but neither the MSA nor any MSO provide the terms or conditions thereof."

Pl.'s Resp. to Def.s' Stat. of Undisputed Facts at ¶ 7(b)(vi) (Doc. No. 22-3).

### E.   Life Celebration Assumes the MSA and its Obligations

In 2011, Mr. Givnish and James Cummings purchased Life Celebration, a small business

providing design and printing services to funeral homes which was formerly formed and owned

by Founders.  Life Celebration assumed the MSA and all obligations, rights, title, and interest

therein in June 2012.

### F.   The 2012 Managed Services Order (the 2012 MSO)

In June 2012, Life Celebration and Xerox entered into a second managed services order

(the 2012 MSO) incorporating the terms and conditions set forth in the MSA.  The 2012 MSO

(1) provided that Life Celebration would pay 66 monthly minimum payments for a net increase of

$4,921.84 to the minimum monthly payment set forth in the 2007 MSO; (2) stated that Life

Celebration would receive an iGen4 90 Print Per Minute Press (iGen4 90 press) and an iGen4

FFPS server to replace its older printing equipment; and (3)  listed "Additional Services" including

a "Sublease – 3,000 sq ft. net of common areas," a "Buildout," and a "Facility Cost."  2012 MSO

at 1-3, Def.'s Ex. F (Doc. No. 20-10).  The parties contend that the "3,000 sq ft. net of common

areas" language pertains to the 125 Hartman Road sublease.  *Id.* at 3.  Included in the 2012 MSO

is an Order Addenda which (1) states that the "Services and Products" identified therein were

---

prior pricing."  *See* 2012 MSO at 3, Def.'s Ex. F (Doc. No. 20-10); 2016 MSO at 3, Def.'s Ex. H (Doc. No. 20-12).

provided subject to the MSA and (2) contains a "Xerox Total Satisfaction Guarantee" stating that, during a 90-day period and at the customer's request, Xerox will replace equipment failing to substantially meet its performance expectations. *Id.* at 5.

Pursuant to its agreement to purchase the iGen4 90 press, Life Celebration signed a corresponding "Xerox iGen4 Press Customer Expectations Agreement" acknowledgement. In doing so, Life Celebration acknowledged that it is responsible for the "[p]rovision of space and siting for the [printer] system that meets Xerox requirements, [i]ncluding environmental controls and HVAC Certification[.]" Xerox iGen4 Press Customer Expectations Agreement, Pl.'s Ex. 9 (Doc. No. 22-5). Xerox requires customers to have and maintain the proper temperature and relative humidity of the room in which an iGen4 90 press is installed.

### G. Life Celebration Obtains Newer Equipment and Corresponding Financial Lease

The iGen4 90 press Life Celebration obtained through the 2012 MSO failed to meet Life Celebration's printing demands. Life Celebration reported various issues with the equipment to Xerox for months. Life Celebration never requested that Xerox replace the iGen4 90 press or other equipment. Instead, Life Celebration accepted Xerox's proposal, communicated by Mr. McGrorty, to trade in the iGen4 90 press for two newer, faster iGene426 machines that would better meet its printing needs. The parties entered into an equipment finance lease agreement pertaining to the leasing and financing for one of the two new iGene426 machines and its related server. It was later discovered that the malfunctioning of the iGen4 90 press may have been caused by a malfunctioning heating, ventilation, and air conditioning (HVAC) system at 125 Hartman Road.

### H. The 2016 Managed Services Order (the 2016 MSO)

In January 2016, the parties entered into a third managed services order (the 2016 MSO)

incorporating the terms and conditions of the MSA.  Pursuant to the 2016 MSO, the monthly

minimum charges under the 2012 MSO decreased by $644.10 for a term of 72 months.  2016 MSO

at 1, 3, Def.'s Ex. H (Doc. No. 20-12).  The 2016 MSO also specified an iGen 426 and an iGen4

FFPS DFE 420i server under "Xerox Equipment & Software Added" and the iGen 490 and server

obtained through the 2012 MSO under "Xerox Equipment & Software Removed." *Id.* at 2-3.  The

2016 MSO again enumerated "Additional Services," including a "Sublease – 3,000 sq ft. net of

common areas," a "Buildout," and a "Facility Cost." *Id.* at 3.  It also included an Order Addenda

which reiterated, in pertinent part, the same information set forth in the Order Addenda

accompanying the 2012 MSO.

## I.    Discovering and Correcting the HVAC System

Cahill Wagner, Xerox's representative assigned to oversee the installation of the new

equipment, arrived at 125 Hartman Road to prepare to install the two new iGen426s in or around

December 2015.  Mr. Wagner discovered, and notified Life Celebration, that the HVAC system

was moved from its proper location.  Both Xerox and Life Celebration were unaware of any

humidification issue until Mr. Wagner's discovery.  Mr. Wagner declined to install the new

equipment until the humidification issue was resolved and the space met Xerox's environmental

standards set forth in its iGen4 Press Installation Planning Guide.  Life Celebration immediately

reported the problem to Dave Daurelle, a Xerox employee managing the 125 Hartman Road

facility.  That same day, Mr. Daurelle temporarily rectified the humidification issue by installing

two portable humidification units.  Shortly thereafter, the issue was permanently corrected so that

the new iGen426s could be delivered and installed, one in February 2016 and the other in March

2016.

8

**J.    Expiration of the Lease**

In late 2015, Life Celebration began communicating to Xerox that it was considering increasing the square footage it occupied from 3,000 to 6,000 square feet to expand its business. While discussing its plans for expansion with its accountants, Life Celebration discovered that the primary lease would expire in March 2020, even though the most recent sublease was to expire in 2022.

After allegedly having multiple conference calls to discuss the situation, Mr. Givnish communicated his frustrations to Kevin Horey, Xerox's Vice President, explaining that he believed no realistic option for staying at the 125 Hartman Road facility for the full 72-month term existed. Neither party has yet to point to any evidence showing that Xerox communicated any distinct and positive statement that it would be unable to provide the occupied portion of the 125 Hartman Road facility through 2022. Life Celebration contends that Xerox fraudulently misrepresented its ability to provide the facility space for the full term of the sublease. It asserts that as a result of Xerox's alleged misrepresentation, it halted its plans for investing in capital improvements. *See* S. Givnish Dep. Tr. at 80:6-10, Pl.'s Ex. 10 (Doc. No. 22-5).

At the time of the parties' submissions here, Life Celebration occupied a 3,000 square foot portion of the 125 Hartman Road facility.[4]  To this date, there is no evidence demonstrating that Life Celebration no longer inhabits the facility space at issue.

### LEGAL STANDARD

A court can grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[4]    Xerox asserted at the oral argument held in February 2020 that Life Celebration still occupied the space at that point in time. Even so, the Court notes that this assertion is not supported by evidence in the record.

9

FED. R. CIV. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might well affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).  Under Rule 6 of the Federal Rules of Civil Procedure, the Court must view the evidence presented in the motion in the light most favorable to the non-moving party and draw all evidence in that party's favor.  *Id.*  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where the non-moving party bears the burden of proof on a particular issue, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.  After the moving party has met its initial burden, the non-moving party then must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**DISCUSSION**

Xerox seeks summary judgment as to both Life Celebration's breach of contract and misrepresentation claims. Xerox alternatively argues that if either claim survives, the Court should dismiss claims for damages which, Xerox believes, are barred pursuant to the MSA. Now, Life Celebration has advanced an additional theory for its breach of contract claim which can be more appropriately construed as an anticipatory breach claim.

## I.    Breach of Contract Claim

Under both New York and Pennsylvania law, a breach of contract claim requires the existence of a contract; a breach of a duty imposed by the contract, and damages resulting from that breach.[5] Life Celebration contends that Xerox breached a duty to maintain the facility space in a suitable condition.

As a preliminary matter, the parties hotly dispute the nature of the subleases at issue. According to Xerox, the subleases consist of written agreements which are fully documented by the managed services orders and are governed by the terms of the MSA. Because Xerox contends that the terms of the MSA govern, it asserts that New York applies. Life Celebration, however, alleges a "breach of an oral lease agreement for real property in Pennsylvania, which has been confirmed in a separate writing subscribed by Xerox" and which is not governed by the terms of

---

[5]      To prove a breach of contract claim under Pennsylvania law, a plaintiff must allege "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.'" *Hopkins v. GNC Franchising, Inc.*, 288 F. App'x 871, 873 (3d Cir. 2008) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Under New York law, "an action for breach of contract requires proof of (1) a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 622 F. App'x 169, 172 (3d. Cir. 2015) (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)).

11

the MSA.  Pl.'s Resp. in Opp'n at 15-16 (Doc. No. 22).  According to Life Celebration's theory, Pennsylvania law applies.  Because Life Celebration fails to demonstrate that Xerox owed it the contractual duty that it claims to have been breached under even its own contractual theory, the Court will not wade through murky waters to determine which contractual theory, if either, substantiated legally valid and enforceable sublease agreements and whether the terms of the MSA, including the choice-of-law provision, are applicable.

Life Celebration faults Xerox for breaching its alleged duty to maintain the facility space in a suitable condition.  Xerox counters that Life Celebration fails to cite any contractual provision that was breached pursuant to an alleged oral contract.

To be clear, the record demonstrates that Xerox did in fact take steps to maintain the facility's HVAC system.  According to Xerox, it fixed a problem with the humidification system in accordance with what it contends was the applicable governing MSA provision.  Pursuant to Xerox's written contract theory, § 7(a) of the MSA provided that in the event Xerox failed to satisfy any of its commitments, (1) Life Celebration shall notify Xerox in writing; (2) the parties shall meet within 10 days to develop a corrective action plan to address the issue; and (3) Xerox shall either modify the services so that they are compliant or re-do the work at no additional charge within sixty days of the finalizing the correction action plan.  Xerox contends that even if it had a contractual duty to address the humidification issue, it fully complied with the aforementioned provision by putting in place a temporary correction the same day that it discovered the malfunction and permanently resolving the issue before installing the new iGen426 printers.

Rather than arguing that Xerox failed to follow this protocol, Life Celebration instead asserts that Xerox's contractual obligation to maintain suitable conditions for the facility space originated from an oral provision agreed upon between the parties.  In doing so, however, it fails

to present any evidence demonstrating that the parties ever orally agreed that Xerox would—apparently at all times and without any notice provided by Life Celebration—maintain suitable conditions for the leased printer equipment. Instead, Life Celebration advances three arguments.

First, Life Celebration cites a provision of the primary lease that Xerox entered into with Nappan & Associates.[6] Pursuant to the primary lease agreement, Xerox, as a lessee, entered into an agreement with Nappan & Associates to keep the facility's humidification system operable and to ensure that semi-annual inspections of the system are completed. Life Celebration is not and was never a party to this primary lease. Even so, Life Celebration contends that Xerox's obligations pursuant to the primary lease necessarily equated to Xerox owing a contractual duty to Life Celebration to ensure that the system was properly functioning. Absent evidence of some contractual provision stating otherwise or an efficacious third-party beneficiary argument, it is unclear how the contractual obligation Xerox owed to Nappan & Associates would have transferred to a duty that Xerox owed to Life Celebration.

Next, Life Celebration cites materials which suggest that *Life Celebration*, as a customer of Xerox—not *Xerox*—was responsible for maintaining proper environmental conditions suitable for the printing equipment. It is unclear to the Court how these materials, as interpreted by Life Celebration or on their face, demonstrate Xerox's alleged contractual duty to maintain a properly functional humidification system.

Third, Life Celebration vaguely asserts that Xerox also breached its general duty as a landlord to maintain the property. Life Celebration fails to cite any contractual provision establishing an inference that this duty existed. Nor does Life Celebration cite any legal authority establishing that such a duty is inherent to a commercial sublessee-sublessor relationship. As

---

[6]     As noted, Xerox assigned the remainder of the primary lease to Direct Mail of Maine, Inc. in September 2014.

Xerox points out, to the extent this argument may be asking the Court to apply the implied warranty

of habitability, such a warranty is inapplicable to a commercial, rather than residential, sublease.

*See Pugh v. Holmes*, 405 A.2d 897, 905 (Pa. 1979) (noting that the implied warranty of habitability

ensures that dwelling premises "must be safe and sanitary").

Thus, even if the Court assumes that the parties' contractual relationship is governed under

a valid oral sublease under Pennsylvania law, Life Celebration fails to point to any evidence

demonstrating even an inference that the contractual obligation it relies upon was ever agreed to

by the parties.  It logically follows that Xerox did not breach a contractual obligation that never

existed.  Because Life Celebration fails to present evidence demonstrating that the oral contract

existed and was subsequently breached, the Court grants Xerox summary judgment as to the breach

of contract claim.

## II.     Misrepresentation Claim

Life Celebration contends that Xerox fraudulently misrepresented[7] that it could provide

leased equipment, services, and a sublease of the facility space for 72 months, even though the

primary lease was set to expire prior to the termination of the sublease.  Xerox argues that such a

claim fails because (1) Life Celebration's tort claim sounds in contract and is therefore precluded;

(2) the claim is barred by the MSA's merger clause; and (3) Life Celebration fails to cite evidence

---

[7]        Under Pennsylvania law, a plaintiff must prove the following elements for an intentional
misrepresentation or fraud claim: "(1) a representation; (2) which is material to the transaction at hand;
(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the
intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the
resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).
"To prove fraud under New York law, 'a plaintiff must show that (1) the defendant made a material false
representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied
upon the representation, and (4) the plaintiff suffered damage as a result of such
reliance.'" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)
(quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d
Cir.1995)).

in support of its *prima facie* case. As to the latter position, Xerox argues that Life Celebration failed to set forth evidence establishing an inference that Xerox made a material misrepresentation, that it had the intent to make a material misrepresentation, and that Life Celebration sustained damages as a result of this material misrepresentation. The first argument is dispositive.

Tort claims sounding in contract are barred under both Pennsylvania and New York law. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 n.8 (3d Cir. 2002) (noting that Pennsylvania's "'gist of the action' doctrine bars plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract") (citing *Phico Ins. Co. v. Presbyterian Med. Serv. Corp.*, 663 A.2d 753, 757 (Pa. Super. Ct. 1995)); *Sichel v. UNUM Provident Corp.*, 230 F. Supp. 2d 325, 328 (S.D.N.Y. 2002) ("New York law precludes fraud actions where the only fraud charged relates to a breach of contract.") (internal quotations and alterations omitted).

Under New York law, "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated," and the "legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987). "In assessing whether an alleged fraudulent representation should be considered 'collateral or extraneous to the contract,' 'as a matter of both logic and law, the primary consideration . . . is whether the contract itself speaks to the issue.'" *Kriegel v. Donelli*, No. 11-9160, 2014 U.S. Dist. LEXIS 90086, at *46 (S.D.N.Y. Jun. 30, 2014) (quoting *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 426-27 (S.D.N.Y. 2004)). In determining whether the conduct at issue is contractual or tortious, courts applying New York law examine "whether the alleged misrepresentation was warrantied or not mentioned by the contract; whether it was the misstatement of a present fact which induced entry into the contract; whether it constituted the

15

failure to perform a duty specified in the contract; and whether it is generally duplicative of the breach of contract claim." *Great Earth Int'l*, 311 F. Supp. 2d at 428.

Similarly, under Pennsylvania law, "[w]hen a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious." *Sunquest Info. Sys. v. Dean Witter Reynolds*, 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999) (citations omitted). "[T]he gist of the action is contractual where 'the parties' obligations are defined by the terms of contracts, and not by the larger social policies embodied by the law of torts.'" *Air Prod. and Chem., Inc. v. Eaton Metal Prod. Co.*, 256 F. Supp. 2d 329, 341 (E.D. Pa. 2003) (quoting *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001)).

According to Xerox, Life Celebration's misrepresentation claim is based on the possibility that Xerox may breach its contractual obligations to provide a sublease for 72 months, an inherently "contractual" assertion. Life Celebration insists that its misrepresentation claim is based on Xerox having fraudulently induced Life Celebration to enter into a sublease despite knowing that it may not be able to provide for the full term. In other words, Life Celebration contends that it was fraudulently induced to believe that Xerox would not breach a material term of the parties' agreement.

It is true that "fraud in the inducement of a contract would not necessarily be covered by [the 'gist of the action'] doctrine because fraud to induce a person to enter into a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself." *Air Prod.*, 256 F. Supp. 2d at 341 (*citing eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 17 (Pa. Super. Ct. 2002)). However, unlike a proper assertion of fraud in the inducement, the allegedly fraudulent

16

statement at issue here is directly related to the terms of the contract itself, as it is based on Xerox's ability to perform a material term of the contract. Indeed, Life Celebration admitted in its briefing and at oral argument that the length of the sublease is a material term of the parties' contractual relationship.

Although Life Celebration relies on *Air Products & Chemicals, Inc. v. Eaton Metal Products Co.*, 256 F. Supp. 2d 329 (E.D. Pa. 2003), in advancing its fraudulent inducement position, such reliance is misplaced. In that case, that plaintiff entered into a contract with the defendant to purchase code-compliant pressure vessels. *Id.* at 333. In order to manufacture code-compliant pressure vessels, a manufacture had to obtain and maintain a certificate of authorization from the certifying entity by participating in a thorough review process and subjecting itself to inspections and auditing. *Id.* at 333-34. Prior to the parties entering into their contractual agreement, the defendant allegedly represented to the plaintiff that it possessed the necessary certifications to manufacture code-compliant pressure vessels when, in actuality, it was not properly certified. *Id.* at 334. The court permitted the plaintiff's fraud claim based on a fraud in the inducement theory to move forward, reasoning that the defendant's obligation to have the proper certification "was not imposed by contract, but rather 'was imposed as a matter of social policy'" given the danger associated with employing improperly manufactured pressure vessels. *Id.* at 342 (citation omitted). Here, Xerox's obligations are defined by the material terms of the parties' contractual agreement, "'not by the larger social policies embodied by the law of torts.'" *Id.* at 341 (quoting *Bohler-Uddeholm*, 247 F.3d at 104).

Because Life Celebration's misrepresentation claim does not allege the breach of any legal duty independent of Xerox's contractual obligations, the Court grants summary judgment in Xerox's favor as to the misrepresentation claim.

III.    **New Assertion of Anticipatory Breach**

For the first time in its response in opposition, Life Celebration asserted that, in addition to breaching its contractual duty to maintain the facility space in a suitable condition, Xerox further breached the parties' sublease when it agreed to lease the facility space for months after the possible expiration of the primary lease.  Life Celebration did not assert this theory in its complaint. Rather, its breach of contract claim as pleaded exclusively pertained to Xerox's alleged failure to timely repair the HVAC system.  In any event, at the time in which Life Celebration submitted its response in opposition to the summary judgment motion, it still occupied the premises at issue and the primary lease was still in effect.  Therefore, no "breach" had yet occurred.  To this date, there is still no evidence suggesting that Xerox has evicted Life Celebration.  To the extent this argument can be construed as an attempt to raise a new anticipatory breach claim under Pennsylvania law, such a proposition fails.

Xerox argues that raising this anticipatory breach claim for the first time this late in the litigation is improper.  Indeed, the Court need not consider Life Celebration's new claim if doing so would prejudice Xerox.  *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir. 1993) (rejecting a plaintiff's disparate impact claim raised after the close of discovery because the claim presented new allegations than those alleged under the disparate treatment claim); *McLaud v. Indus. Res., Inc.*, 715 F. App'x 115, 121 n.5 (3d Cir. 2017) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)) ("A plaintiff may not amend his complaint through arguments in her brief in opposition to a motion for summary judgment.").

Even if the Court were to assess the merits of Life Celebration's anticipatory breach claim, such a claim fails.  "[T]o constitute anticipatory breach under Pennsylvania law there must be 'an *absolute* and *unequivocal* refusal to perform or a distinct and positive statement of an inability to

do so.'" *Edwards v. Wyatt*, 335 F.3d 261, 272 (3d Cir. 2003) (quoting *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies of Greater Phila.*, 489 A.2d 733, 737 (Pa. 1985)) (alterations and emphasis in original).   As Life Celebration concedes, this "definite and unconditional repudiation of a contract" must be communicated "by one party . . . to another." Pl.'s Resp. in Opp'n at 25 (Doc. No. 22-2) (citing *Jonnet Dev. Corp. v. Dietrich Indus., Inc.*, 463 A.2d 1026, 1031 (Pa. Super. Ct. 1983) (citations omitted)).   Life Celebration failed to cite any evidence demonstrating the inference that Xerox communicated to Life Celebration in a distinct and positive statement its inability to perform under the sublease.   Therefore, no newly asserted anticipatory breach claim survives summary judgment.[8]

### CONCLUSION

For the foregoing reasons, the Court grants Xerox's motion for summary judgment in its entirety.   An appropriate order follows.

BY THE COURT:

GENE E. K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[8]      Because no claims survive summary judgment, the Court need not address whether any damages claims are barred by the provisions of the MSA.